# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

JEAN GERMAIN,

    Plaintiff,

v.

HOLLY L. PIERCE,

    Defendant.

Civil Action No.: TDC-18-3655
Consolidated Case: TDC-18-3713

## MEMORANDUM OPINION

Plaintiff Jean Germain, an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed a Complaint under 42 U.S.C. § 1983 against Defendant Holly L. Pierce, a Nurse Practitioner employed at the prison, alleging that Pierce has denied him access to adequate pain medication and pain management treatment, in violation of the Eighth Amendment to the United States Constitution. Germain filed a second Complaint against Pierce which was identical in all relevant respects to the original Complaint. *See Germain v. Pierce*, No. TDC-18-3713 (D. Md. 2018). The two cases have been consolidated for all purposes.

Pending before the Court is Pierce's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion, construed as a Motion for Summary Judgment, will be GRANTED.

# BACKGROUND

## I. The Complaint

In his verified Complaint and Affidavit, Germain reports that he suffers from cervical spondylosis with mild spondylitic changes and effacement of the ventral sac at C3-C4. Germain also has had carpal tunnel syndrome; stab wounds to both jaws; injuries to his left elbow, left hand, and both shoulders; and a broken jaw. According to Germain, these conditions cause him to suffer excruciating pain, including neck pain that "vibrates to his lower extremities," that often leaves him incapacitated and worsens at night when he attempts to sleep. Compl. ¶ 6, ECF No. 1. He asserts that as result of his pain, he experiences complete numbness on his left side, is sometimes unable to bend down to tie his shoes, and at times has to walk stooped forward. He also experiences memory loss and confusion. These conditions have made assignment to a top bunk inappropriate because he suffers shoulder pain when climbing up and because he has fallen off the top bunk while sleeping because he has forgotten he is there. He also claims that he continues to "experience accidental bowel movement[s] which has caused arguments" with his cell mate. Germain Aff. ¶ 8, Opp'n Mot. Summ. J. Ex. 4, ECF No. 14-2. On some nights, he is "forced to sleep sitting on a chair" as it is too painful to get to the top bunk. *Id.* ¶ 2.

According to Germain, he is receiving "no treatment" for his medical conditions, and Pierce has been instrumental in denying him pain management because she refuses to see him even when he is referred to her for treatment, she lies and claims that he "only wants Tramadol and Neurontin," Compl. ¶ 11, and refused to follow orders issued by an oral surgeon who examined Germain at the University of Maryland Medical Center ("UMMC") who advised that Germain be sent to a neurologist and pain specialist for treatment. As relief, Germain seeks a declaratory

judgment that his constitutional rights have been violated, an injunction requiring Pierce and others to provide him with adequate medical care, and unspecified monetary damages.

## II. Medical Treatment

Medical records and affidavits submitted by both parties establish the following facts. On July 24, 2012, Germain received a medical order requiring his assignment to a lower bunk and for front cuffing for one year due to right shoulder pain. Another order for lower bunk assignment for a three-month period was issued on January 6, 2015.

On February 15, 2017, after an examination by Dr. Timothy J. Chryssikos at the University of Maryland Neurosurgery Clinic to address neck and arm pain, including a review of records of a magnetic resonance imaging procedure ("MRI") on Germain, Germain was diagnosed with "spondylosis of cervical region without myelopathy or radiculopathy." Def.'s Med. Records at 6, Mot. Summ. J. Ex. 1, ECF No. 9-4. Dr. Chryssikos did not recommend surgery but instead directed that Germain continue physical therapy and found that "adjustments in his current pain regimen can be considered." Id.

On February 20, 2017, Germain told Krista Bilak, a registered nurse practitioner, that the present pain management regimen, which included the medication Neurontin (also known as Gabapentin), was not effective. Bilak recommended a review of the pain management regimen by a clinical pharmacist. On March 8, 2017, Naa Odifie, a pharmacist, recommended that Germain receive Mobic and Tramadol (also known as Ultram) and that Neurontin be discontinued. When his Neurontin prescription stopped on April 14, 2017, Germain complained to medical personnel. On May 10, 2017, Bilak prescribed 30 milligrams of Cymbalta to treat Germain's pain. During May and June 2017, Germain complained to nurses that the Cymbalta was not effective.

On or about August 15, 2017, Dr. Aresahegn Getachew, the Western Regional Medical Director, referred Germain to an on-site pain management clinic. On August 21, 2017, Germain was seen by Dr. Ava Joubert-Curtis for his chronic pain. Germain reported, orally and through a handwritten page of notes, that he had throbbing pain, has to walk leaning forward because he cannot straighten his back, was confused and almost fell off the top bunk, and had accidental bowel movements. When Germain requested prescriptions for Neurontin and Tramadol, which he said were the only pain medications that worked for him, and Dr. Joubert-Curtis advised him that those medications were not recommended for long-term use and prescribed Mobic to treat Germain's pain.

On August 31, 2017, ten days after Germain was prescribed Mobic, he reported to a nurse that he had seen Dr. Mahboob Ashraf had advised him to stop taking Mobic after Germain reported he had blood in his urine and stool. The nurse asked Germain for a urine sample, but he declined. On September 11, 2017, Germain visited Dr. Ashraf, who prescribed 600 milligrams of Neurontin, twice a day for two months, for treatment of his neck and back pain, based on the cervical spondylosis as identified by Dr. Chryssikos and Germain's report that Cymbalta did not help the pain. Dr. Ashraf's request, however, was disapproved by the clinical pharmacist. On September 21, 2017, Dr. Ashraf submitted another request, noting that Germain did not want to take Mobic because of its side effects, and also added an order for 20 milligrams of Baclofen. This time Dr. Ashraf's request was granted by the Regional Medical Director, but only after the prescription was modified so that the Neurontin dose would be tapered off by 200 milligrams per week. The tapering was suggested because of a study that concluded that use of Neurontin for chronic low back pain of more than three months in adults showed "a significant risk of adverse effects without any demonstrated benefit." Def.'s Med. Records at 41.

On October 11, 2017, Germain began expressing concern that his Neurontin prescription would be tapered down and saw a psychiatrist to discuss his anxiety. On October 26, 2017, Germain reported to sick call complaining that the Neurontin was being stopped without a replacement medication. Germain was referred to a medical provider to evaluate his medications.

On November 7, 2017, Germain was seen by Pierce for that medication evaluation. Germain recounted some of his history of injuries, including injuries to his jaw and left shoulder when he was thrown through the windshield during a car accident in 1994, a 1994 stab wound causing nerve damage in his left hand, and his history of burning lower back pain and shooting pain down the back of both of his legs to his toes. Germain also reported that his pain caused bowel urgency, but not incontinence, as well as memory loss. He told Pierce that Cymbalta caused him nausea and asserted that the only medications that worked for him were Neurontin, Baclofen, and Tramadol. Germain also told Pierce that he was told by a different medical provider that he "should never be taken of[f]" these medications." *Id.* at 52. Although Pierce found no evidence of nerve damage, because Germain was not interested in any other pain regimen, Pierce ordered taper doses of Neurontin, to end after one month, and Baclofen to end after three weeks, which were approved by Dr. Getachew. The following day, however, the pharmacy informed Pierce that Germain had already received a taper dose of Neurontin, so she discontinued the new taper dose. On November 20, 2017, Germain visited Dr. Joubert-Curtis because of episodes of memory loss and complained that his Neurontin prescription had been discontinued. During sick call encounters with a nurse in the following weeks, Germain expressed his belief that only Tramadol and Neurontin would be effective for his pain.

On December 14, 2017, Pierce saw Germain again for pain management. During this encounter Germain informed Pierce that he was allergic to Tylenol and stated that "Ultram

[Tramadol], Neurontin and Baclofen are the only medications that improve his symptoms" and that if he could not have those medications, he wanted to see a neurosurgeon. *Id.* at 62. Where Germain continued to describe his shoulder and back pain, Pierce advised him to use warm compresses to ease his muscle stiffness before activity and ice to reduce inflammation and pain related to exercise. Based on his report of blood in his stool, Pierce ordered laboratory tests. On December 28, 2017, Pierce saw Germain again for pain management, but Germain again stated he had no interest in medications other than Tramadol, Neurontin and Baclofen.

On January 4, 2018, Germain was seen by Dr. Justin Nassiri, an oral surgeon at UMMC. The visit was the result of an August 14, 2017 referral by Dr. Alan C. Graves, a dentist, for an oral surgery consultation to assess Germain's complaint of chronic jaw pain caused by a fracture in 1993. Dr. Nassiri's review of a panoramic x-ray showed no bone pathology. Thus, Dr. Nassiri concluded that Germain's pain was not dental-related and recommended that Germain see a neurologist and consult with a pain specialist for his chronic pain.

On January 10, 2018, Pierce saw Germain again. Germain reiterated that he had no interest in medications other than Tramadol, Neurontin, and Baclofen and claimed that the oral surgeon at UMMC had recommended those medications. Pierce could not verify that claim because Dr. Nassiri's report was not available at that time, so she offered alternative pain management options. Germain declined and told Pierce, "Let's wait on the report." *Id.* at 72.

On January 18, 2018, Germain submitted a sick call request to seek a neurologist to follow up on Dr. Nassiri's recommendation and to see a doctor rather than Pierce to address pain medication. On January 22, 2018, Pierce saw Germain again, but Germain continued to refuse pain medication options other than Tramadol, Neurontin, and Baclofen. According to Pierce, Germain was not sent to a neurologist following Dr. Nassiri's recommendation because the prior

6

neurosurgery consultation with Dr. Chyrssikos had revealed no neurologic condition requiring surgery, and the conditions identified as warranting a return visit—a neurologic deficit or a new pain condition—had not occurred.

During the January 22 visit, Pierce requested physical therapy for Germain. Germain's initial physical therapy evaluation occurred on February 1, 2018. He attended only one additional session, on February 15, 2018. Germain was noted as a "no show" for physical therapy appointments on February 8, 20, 22, and 27, as well as on March 1, 6, 10, and 13. *Id.* at 78-87. According to Germain, he never refused to work with a physical therapist.

On March 28, 2018, during another visit with Pierce, Germain again expressed his desire for prescriptions for Neurontin, Tramadol, and Baclofen. Pierce did not prescribe these medications because she concluded that they were not clinically appropriate for his condition. In a sick call visit with Regina Lease, a registered nurse, on April 28, 2018, the nurse denied Germain's requests for these medications and offered only over-the-counter pain medications.

In total, Pierce saw Germain for pain management on six occasions: November 7, 2017, December 14, 2017, December 28, 2017, January 10, 2018, January 22, 2018, and March 28, 2018. According to Pierce, she has not refused to see him when requested. Although she asserts that in each encounter Germain has "demanded" Neurontin, Tramadol, and Baclofen for pain, Pierce Aff. ¶ 5, Mot. Summ. J. Ex. 2, ECF No. 9-5, Germain disputes that he demanded to be prescribed any specific medications. Regardless, Pierce asserts in her affidavit that these medications are not necessary or appropriate because his clinical examinations have not shown the kind of spasms or nerve damage that they generally address. Pierce also asserts that Neurontin and Tramadol have been identified as medications with patterns of overuse and abuse within the prison system, including hoarding for improper use for narcotic and sedative effects or trading them to other

7

inmates. Accordingly, the Maryland Department of Public Safety and Correctional Services ("DPSCS") has sought to eliminate the use of Neurontin for conditions other than the uses approved by the Food and Drug Administration, to treat seizure conditions and nerve pain cases by herpes or shingles, "barring exceptional circumstances." *Id.* ¶ 7. Germain does not have such conditions. As for Tramadol, Pierce asserts that because it is a synthetic opioid that presents a risk of addiction or abuse, it should not be prescribed for long-term use absent special circumstances. According to Pierce, recent studies have shown that Tramadol does not work as well as other available drugs, and that it presents serious risks if used with alcohol.

As a result, Pierce offered Germain other alternatives such as Tylenol, Mobic, and Cymbalta. According to Germain, these medications were tried before and were discontinued because they were ineffective or caused more harm than good: Cymbalta caused numbness in his tongue and lips as well as bloody diarrhea, and drugs such as Tylenol are problematic because of his history of gastrointestinal bleeding. Pierce, however, asserts that clinical examinations have not revealed signs of the side effects that Germain has reported to her—nausea from Cymbalta and Mobic, and an allergic reaction and shaking hands from Tylenol. As for his other conditions, Pierce asserts that Germain has not reported accidental bowel movements to her, he does not show signs of a confused mental state, and his physical condition does not warrant a lower bunk restriction.

According to Pierce, the view of Germain's medical providers is that based on his clinical presentations and his refusal to try any other pain medications, that a referral to an off-site pain management specialist is unwarranted.

8

## DISCUSSION

Pierce seeks dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. In support of her Motion, Pierce argues that the record does not support a finding of deliberate indifference to a serious medical need.

### I.     Legal Standards

Pierce has titled her motion as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Germain has not asserted that he needs additional discovery in order to address the Motion and in fact submits

his own evidence with his memorandum in opposition to the Motion. The Court therefore will construe Pierce's Motion as a motion for summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Eighth Amendment

Germain asserts that the alleged lack of treatment for his chronic pain violates the Eighth Amendment. The Eighth Amendment protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations and internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Here, although Germain has a serious medical need resulting from various conditions causing chronic pain, the record does not support a finding that Pierce has acted with deliberate indifference to that need. Pierce's role in Germain's treatment was limited to the period from November 2017 to March 2018, during which she saw Germain regularly to address his pain

management. Although she did not offer Germain the medications that he believed would be effective—Neurontin, Tramadol, and Baclofen—her decision not to prescribe them followed a course of treatment over a nine-month period during which other medical providers, including physicians such as Dr. Joubert-Curtis, advised him that those medications were not recommended for long-term use and offered drugs such as Mobic and Cymbalta. Although in September 2017, Dr. Ashraf agreed to provide Germain with Neurontin and Baclofen, those drugs were approved only as taper doses by Dr. Getachew, with the doses to be reduced over time and ended entirely after one month, in part because of studies showing a high risk of adverse effects. Thus, when Pierce refused Germain's requests for Neurontin, Tramadol, and Baclofen, she was acting consistently with this lengthy course of treatment and with DPSCS policy, which Germain has not disputed, that seeks to limit the use of these drugs because of the potential for abuse in the prisons. She was also acting on her clinical opinion that Germain did not exhibit the conditions, such as seizures and particular kinds of nerve pain, that would warrant their use under FDA guidelines. Even if she was incorrect about that determination, or was incorrect in her conclusion that Germain did not exhibit the kinds of side effects he reported to her, those conclusions would, at most, constitute negligence, not deliberate indifference. *See Jackson*, 775 F.3d at 178.

Under these circumstances, Germain's dispute with Pierce on whether those drugs should be prescribed constitutes a disagreement over medical treatment that does not amount to deliberate indifference. *Scinto*, 841 F.3d at 225. Even assuming that Germain is correct that the side effects were worse than perceived by Pierce, there is no evidence that Pierce saw clinical evidence of those side effects or refused to consider other medication options. She also arranged for physical therapy, which Germain started but did not complete. These facts do not support a finding that Pierce was subjectively aware that declining to prescribe Neurontin, Tramadol, and Baclofen

would create an excessive risk to Germain's health and that she refused to act on that knowledge. *See Jackson*, 775 F.3d at 178.

As for Germain's complaints that he is assigned to a top bunk, beyond Pierce's assertion that it was not medically necessary, which is another disagreement relating to treatment that does not constitute deliberate indifference, there is no evidence that Pierce specifically refused to issue such an order when requested by Germain. The Court will therefore grant the Motion and enter summary judgment in favor of Pierce.

## CONCLUSION

For the foregoing reasons, Pierce's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is GRANTED. A separate Order shall issue.

Date: February 19, 2020

THEODORE D. CHUANG
United States District Judge